The first case today is No. 23-1802, United States et al. v. American Airlines Group Inc. At this time, would Counsel for American Airlines please introduce himself on the record to begin? Thank you, Your Honors. Gregory Garr on behalf of American Airlines. If you could just pull this up a little bit higher. Good morning, Your Honors, and may it please the Court.  You may. Your Honors, this case involves a challenge to a joint venture between American Airlines and JetBlue that during the nearly two years it was in existence led to 50 new routes to new destinations, more flight times on 130 existing routes, and a 200 percent increase in capacity or seats without any corresponding price increase. In holding that this joint venture was invalid under the antitrust laws, the District Court committed two fundamental and overarching legal errors that cut through all of its factual findings and required reversal. First, the District Court based its finding of anti-competitive harm solely on the reduction of competition between the two joint venture participants in and of itself, despite plaintiff's failure to show any increase in prices, reduction in output, or other consumer harm. And second, the District Court categorically refused to consider the pro-competitive benefits of the collaboration because they stemmed from an agreement that it found to be anti-competitive because of the reduction in competition in the first instance, barring consideration of the numerous ways in which this agreement, the Northwest Alliance, unlocked efficiencies that the District Court itself recognized. I'm a little... Are you suggesting that... Oh, go ahead. Are you suggesting that if there's no price increase at all, there's no antitrust violation per se? So, Your Honor, this Court and the Supreme Court has emphasized that the hallmark for a violation of showing anti-competitive harm is showing an impact to the competitive process, which in turn, this is what Justice Breyer said for the court in town of Concord and increased output reduction are the hallmarks for that. That's what the Supreme Court itself has emphasized. And that's where the District Court fundamentally went off the rails here. Why wasn't there a finding of output reduction with respect to simultaneous flights on certain routes and with respect to certain routes being abandoned? So this is the government's case before this Court. It points to two routes out of the 175 routes subject to the Northeast Alliance. And on those two routes, one, the number of flights per day decreased from 16 to 15, the other from 29 to 25. But on those routes, capacity, the seats, rose threefold. So in that respect, even on those two routes, there was not an output reduction, there was an output increase. But fundamentally, the problem is, is they're not looking to the output increase in the market at large. This was an alliance that overwhelmingly increased... But I just want to understand how, doing the analysis, just take me step by step. You can't get to step two unless you show an anti-competitive effect at step one. A significant anti-competitive effect. That's correct, Your Honor. So is the word significant? It is. That comes out of Alston and American Express, Your Honor. And do you think that the findings of the route abandonment or routes that one carrier was on, no longer on, that he says directly is a result of the NEA, and the fact that simultaneous flights at the same time weren't happening, don't count as significant output reductions? I don't think they would be, Your Honor. And what's your best authority for it not being significant and therefore no direct competitive effect? Well, I think it's frankly common sense. We've got two routes out of 175 in which output actually increased because of the seats. And I think it's important to go back to what the district court said. This is on page 77 of the addendum. It said that it was the reduction in competition between the competitors that in itself was the anti-competitive part. No, I understand. But putting that aside, I guess I just want to isolate on this. If I want to fly and there are two carriers flying at 10 a.m. and now there's only one carrier flying at 10 a.m., is there anything in the record that shows the one carrier flying at 10 a.m. now has more seats than there were when there were two carriers flying at that same time at that time? It's the government's database that we refer to in our 28-J letter, Your Honor, that the government doesn't dispute the data. Its own Department of Transportation's own record shows that seats increased threefold. This is only a narrow segment of the many benefits created by the NEA. It doesn't look to the market at large. And I think it's important to understand how many routes. I thought there were routes in addition to the simultaneous flying through schedules and optimization. I thought there were some routes that, through market allocation, either American stopped running that route or JetBlue stopped running on that route. So there were no non-carbide routes where JetBlue stopped running them, Your Honor. There were, I believe, 10 or 12 where American exited. But on those routes, output didn't increase, didn't decrease. It increased because there were more seats. And you've got to look at the impact on the whole NEA, which led to more routes to new destinations, substantially more frequency. And you say that's a step one point, not a step two point? I know you're saying it can be a step two point, but you're saying there is authority that suggests at step one we would say that they don't even get to step two? Right. The authority that I pointed to is significant anti-competitive harm. And here I think it's important to realize that the government's case at trial was attempting to show likely future harm in the form of likely price increases. Well, that's the second piece of it. That's the indirect effects. Well, that was their case below, Your Honor. We have findings by the district court. He has direct effects, then he's got indirect effects. Right. And in the direct effects box, he points to the things I was just describing. Then in indirect effects, he talks about upward pricing pressure. So with respect, Your Honor, on direct effects, and I point you to page 77 of the addendum, it all boils down to the reduction in competition between the two joint venture participants, which as a matter of law is flawed. That's inconsistent with the Dogger case of the Supreme Court. It's inconsistent with the town of Concord and Grappone cases from this court where the court recognized that harm to competitors, and in fact, the elimination of competitors, that's what Justice Breyer said in the Grappone case, in itself is not anti-competitive. You have to link it to actual consumer harm in the marketplace in the form of increase in price, output reduction, and I'm happy to continue with this conversation on the two flights of the 175 where they say there was a decrease in frequency. That's not a significant anti-competitive effect, which doesn't even satisfy step one, and that's all they have before this court, Your Honor, and I think that in itself speaks volumes. What they tried below was a case in which they tried to show likely future price increases, and that's why their own experts... On that score where the district court found upward pricing pressure because of the barriers to entry in the market and the concentrated nature of the market, what's your answer to that aspect of the finding? So every merger simulation in history shows upward pricing pressure. That's not the same as a likely price increase because it doesn't take into account downward pricing pressures, efficiencies, the way in which the market reacts, and their own expert acknowledged that it didn't take that into account. So the district court's statement that there would be upward pricing pressure tells you nothing about likely price increases, and that's on page 56 of the addendum. The district court did not find, did not accept Dr. Miller's evidence with respect to likely price increases. It rejected that. So you don't have a likely case before you. All you have is the actual case, which is based on the erroneous legal premise that the reduction in harm between competitors, something my friends go back 60 years to try to find in a merger case that involved a monopoly, is anti-competitive harm, but that's utterly inconsistent with this court's decisions, Town of Concord and Grappone, Supreme Court's decision in Dager where you had a joint venture among significant competitors that ended competition, and the court made clear that that was not the sort of per se, quick look kind of analysis that the district court engaged in here. And I do want to... What do you do with the fact, I'm stuck on the factual findings by the district court found decreased capacity, lower frequencies, and reduced consumer choice. And I see no argument in the blue brief that any of those findings were clearly erroneous. So it seems to me, how do you get around that? So the district court said in the very first sentence of its opinion that this case turns on the meaning of competition under the antitrust laws. That's a legal question. The court committed a legal error because it had believed that the reduction in competition in itself was an anti-competitive harm. But it went much beyond that. It actually found decreased capacity and it rejected your claim of increased capacity. So with respect, I don't think that that's right. I think it grounded, and this is clear on page 77 of its decision, the finding that Your Honor referred to, I think one point I would make is that district court said or, not and. And then if you go further down, this is on page 37 of the addendum, I believe, the district court, what it's referring to is the decrease in frequencies on a few flights. But that's... And this is all the government has before this court, a decrease in frequency on two out of 175 flights. That in itself is not a decrease in output because frequencies doesn't tell you about output, which is seats, capacity. So it sounds like you're saying it was clearly erroneous, but you've made no argument that it was clearly erroneous. No. What we're saying is there was a legal error. There were two fundamental legal errors that cut through this decision. One is the finding that the reduction of competition in itself was anti-competitive. But this is what led the district court to claim on page 13 and 92 that this was a naked restraint. And then you keep mentioning the seats. I'm confused as to what's in the record before us on seats. As I understood it, DX751 is the exhibit that you point to, but that doesn't appear to be in the record. So it is in the record. It was admitted into evidence, Your Honor, initially. It's a government database that we believe you can take public notice of, Your Honor. But what I would say is... How would we take... You want us to take judicial notice of it? Yes. And the other thing I would say, Your Honor, is look at the chart on page 30 of our reply brief, which shows an increase in ASMs, which is available seat miles, and it shows how the airlines involved in Northeast Alliance, the ASMs, increased at a much greater rate than the other airlines, which shows the output increase under this. And so... Can I just... It would be helpful for me... I hear three separate contentions you may be making. One of them you definitely make in your brief, which is the district court relied on the idea that competition itself was harmed because a competitor was taken out of the market. That alone is enough. Therefore, you say that's legal error.  And where it identifies what it contends are output reductions. And you either are saying that's clearly erroneous, or you're saying if it's not, it's so insignificant, it can't be a direct effect. I didn't recall you making the third argument in your brief before. So Your Honor, I think what you described as a third argument is really our response to the government's argument on appeal, which was to pin it from the case that they tried below, trying to show likely price increases. But we don't care about what they tried below, we care about what the district court found. Yeah, I don't think the district court rested on that in its legal analysis. You don't think it rested on output? No. I think it made Judge Kayada refer to the best that they could point to, which is, I think, on Addendum 37. And that's a stray reference to a few frequencies. And I think the government is going down on what... It's on page... It's on Addendum 43, too. Decreased capacity, lower frequencies, reduced customer choice. Right? And plaintiffs... The reason why that doesn't work, Your Honor, is plaintiffs' own experts conceded that there was an output reduction in this case. So then you're saying it's clearly erroneous, but we've been presented with no argument that there is any clear error in the fact finding. So I don't think you can disentangle the legal errors from what you're describing as the factual finding, Your Honor. The whole opinion, again, starting with the very first sentence of the opinion, rests on an erroneous legal concept. Well, I take that point. And if that's the argument, then if we either agree with you or not, right? Okay, but we're just asking if we don't agree with that, and we conclude that there was an independent finding. So in Direct Evidence of Actual Harm, page 67 of the opinion, first, it's a limited vigorous competition. And then in the course of that, it specifically says that there has been a reduced output based on the fact that it's operating now as one carrier and scheduling optimization. Then later on, it talks about how there's market allocation, and they've abandoned certain routes because of that divvying up. So if I did not think those aspects of the analysis were dependent on the claimed legal error, is there some place in your brief where you're saying, nonetheless, there's reversible error? And what is it that you're saying, and where is that in the brief? That's what I'm trying to figure out. What I would say at that point, Your Honor, is the legal error had stepped through the that pro-competitive benefits from the arrangement simply because they arose from the collaboration that it found to be anti-competitive. But it didn't. How did it? I guess I didn't see a refusal. I saw he listened to the experts that the defendants put forward and assessed their testimony and expressly found that they were biased and largely not credible. So what was left? So I would point you to page 95 of the addendum, where the court's at the beginning of the step two analysis, and the court says that benefits that arise from the collaboration that it found to be anti-competitive cannot be credited. And that's wrong under the government's own collaboration guidelines, which make clear that you assess pro-competitive benefits without regard to anti-competitive effects. And it completely negated the rule of reason analysis here. This was an alliance that had overwhelming efficiencies. The district court itself recognized that on page 41 of its opinion, where it said that the slots in New York were used more heavily and efficiently, the district court itself recognized those efficiencies. It didn't credit them at step two, which completely negated its rule of reason analysis. And that itself is error that requires reversal here, Your Honor. This was a rule of reason analysis. On page 95 of the addendum, is this what you mean? The district court says, other claim benefits lack evidentiary support entirely or find support only in an artificially narrow lens as applied. For example, as the court's finding of fact explains, defense have claimed but not proven that their fleets have actually grown as a result of the NEA. Likewise, they've claimed but not proven that corporate customers in Northeast previously viewed Delta United as their only... Is that what you're talking about? So I'm referring to 95. I don't know if you're reading from 95. What I'm referring to, it says defendants claim benefits, quote, arise only if defendants mimic one carrier, elect not to compete with one another, cooperate in ways that competitors normally would not. Benefits arising in this way cannot justify defendants' collusion. What that is, and he repeats it again elsewhere, it's 95, is saying that because the benefits arise from the collaboration that it found to be anti-competitive because it reduced competition between the joint venture participants. This is addendum? Addendum 95, Your Honor. It's the district court's decision. This is where it says, these features arise only if defendants mimic one carrier, elect not to compete with one another, and cooperate in ways that horizontal competitors normally would not. And that's why, that's its finding of anti-competitive harm on page 77 of the addendum. It's the reduction of competition between the joint venture participants. And that goes back to the central flaw apparent on page one of its decision, which is what the meaning of competition is under the antitrust laws. And the best that the government has on this is a Lexington Bank case, a 60-year-old bank involving a merger that resulted in monopolies that is utterly inconsistent as the government... is a way of discounting the claim network effects benefit. And you're saying the ground that he gives for discounting it is legal error because it just presumes that if you got those benefits through eliminating a competitor, per se, that can't be a pro-competitive effect. That's exactly right, Your Honor. And that's what the government's own amicus acknowledged, the law professors acknowledged that's what the district court did. I mean, that's wrong in the government's own collaboration guidelines, which recognize that you assess pro-competitive benefits without regard to anti-competitive benefits. Unless my colleagues have other merits questions, I just, before you sit down, want to just address mootness. Yes. So, we don't think the case is moot, Your Honor, because we have an injunction that applies to us that prevents us from entering into any similar arrangement and that gives the district court continuing jurisdiction over this case for at least 10 years. That's a live dispute. We challenge that injunction. If this court vacates, the decision is that it should, that the injunction would go. And this case is very different from the JetBlue Spirit merger case in which both parties stipulated to the dismissal of the appeal, which left in place an injunction that enjoined the transaction of that case. Tell my wife that you wanted to challenge it, had the same terms, no one in the airline industry can do the following things, and you wanted to challenge it on constitutional grounds. For standing purposes, normally I would think we would need some representation that you wanted to do something that the statute was interfering with. As I read the record, we don't have anything saying that. There's nothing in the record where you're attesting that you want to do it. And we don't have anything from JetBlue suggesting that they want to do anything. So why does that sort of intuitive sense suggest that, well, until somebody tells me they have some desire to do something, the injunction's interfering with, what's the point of us getting involved in it? So we do, Your Honor. I mean, this is a decision that, under a framework of antitrust law that is completely inconsistent with this Court's precedents and the Supreme Court precedents, will eliminate any future agreements that are anything like this going into the future. If this Court agrees with us that the decision's infected by legal error, it should vacate that decision. I think I'm, that's a slightly different response. And to answer your question, Your Honor, we do want to go forward with similar arrangements. I mean, obviously, JetBlue is not here. I cannot speak. We do. But I think what can't be the right answer is that this decision would be left in place and that we have no opportunity to challenge it. If the Court believes... Well, you'd have an opportunity to challenge it, just the moment you made clear that there was a live dispute in the sense that you want to do something, the injunction's getting in the way of. Normally, that would be in the record. It would be like an affidavit from somebody from the company saying, you know, my intention or something in a complaint or something like that. We just don't have anything like that. So the reason why you don't have it, Your Honor, is we laid out in a footnote in our opening brief that the case was not moot, that it was live because we were challenging the injunction, and the government didn't respond to that. I don't believe it takes a different position on jurisdiction. I think if the Court believes the case is somehow moot, then it must vacate the decision because it would be... I think the one thing that can't happen is that we would be deprived of any opportunity to challenge this decision, leave this decision, and in fact, it would leave in place an injunction that prevents us from entering into any similar arrangements under a legally erroneous antitrust framework and that gives the District Court the power even to modify the injunction as it sees fit going forward for at least the life of the injunction. But if we were to vacate on mootness grounds, tomorrow you could make any other arrangement with JetBlue and you could be back in square one in another litigation with U.S. DOJ, right? Well, I think, first of all, Your Honor, usually and oftentimes DOJ will wait until there's actual harm. It didn't do that here. I mean, if there were actually harm from this arrangement, then someone could challenge it in the future. But I think if that's a problem, Your Honor, that's a reason why it's not moot. We don't think it's moot. We think it's live. We think the District Court decision should be vacated. But I think if Your Honors believe it is moot, then the only proper result is to vacate the decision and then both parties, you know, if the agreement is put back into place and DOJ wants to challenge it again, they can litigate at that point. But I don't think if leaving this decision in place, fundamentally affected by these errors of law, not only would harm American, which would wish to enter into similar arrangements, but would be disservice to competitive activity in the circuit. Just so I'm understanding, when you say similar arrangement, the injunction only applies with respect to you and JetBlue, correct? It does, but it says it doesn't apply, unlike the JetBlue spirit injunction, which was limited only to that specific. I understand, but it's only when you say you want to do other things, you mean you want to do other things with JetBlue? That's correct. We would seriously consider that yes. And the injunction prevents us from doing that, any sort of similar arrangement, Your Honor. Thank you. Thank you, Your Honors. Thank you, Counsel. At this time, if Counsel for the United States and all would please introduce themselves on the record to begin. Good morning, Your Honors. May it please the Court. Daniel Haar for the United States and the Plaintiff's States. American is attempting to re-litigate the facts on appeal, but it has not challenged any of those facts as clearly erroneous. Now, I'd like to start off with a question Judge Helke posed at the beginning of Mr. Sullivan's case, is this increase necessary at step one? It's clearly no under this Court's Sullivan precedent. Now, American quoted Sullivan, and it left off the word usually. Sullivan says, harm to competition is usually shown through increased prices or reduced output. But it said, the fundamental question is harm to the competitive process. And following Board of Regents, this Court said, even more important than a showing of price or lower output is a showing that price and output are unresponsive to consumer preference. And that's exactly what happened here. Decisions on who flies on which routes were decided under a committee of American and JetBlue executives, not by the free market anymore. That makes the market unresponsive to consumer preference. But in addition, we did have price and output evidence. On price, American and JetBlue were fierce competitors on price before the NEA. That's what the district court found at addendum 22. When JetBlue entered a route, American dropped its prices. When American exited a route, JetBlue raised its prices. This is significant competition, and it was eliminated under the NEA as the district court found at addendum 39-40 and 77-78. And JetBlue's own CEO testified, we no longer compete within the NEA. And the district court found in 78 that this extended to the six carve-out routes in Boston. That's not legal error, because we know that before the NEA was established, this competition was directly benefiting consumers. And it's all been wiped out as a result of the NEA. That satisfies the requirement of a prima facie step of harm. Counsel, I think contrary to opposing counsel, your position is, and you started mentioning it, Judge Sorokin below made weight of the evidence, credibility findings, including competing experts. It's a factual, you would agree it's a factually based decision, not as a matter of law necessarily, right? Absolutely. It's a fact-bound decision, and the facts decide the appeal. And none of these facts have been challenged. These facts include reduced frequency and capacity. JetBlue's Eric Friedman testified, and the court relied on this testimony at addendum 44, that after American exited Boston LaGuardia, JetBlue would not have the same capacity until sometime around 2025. Now, American has tried to contradict facts found by the district court by pointing to a database that was not included in the trial record. American says seats have gone up threefold. But American is counting that from the start of 2021. American didn't exit that route until 2022. So what it's really trying to do is take credit for the general increase in output that has been occurring in the market. And just to take a step back, because American has claimed on page 13 in its opening brief, and on its late filed 28J letter from Friday afternoon, that there's been a 200% capacity increase attributable to the NEA. That's nowhere in the factual findings. And if you understand what's happening in the market, all the airlines are increasing capacity at this moment because this is in the COVID recovery period. In March of 2020, demand for airline services fell off a cliff. And then each airline steadily put more and more capacity back on the market. They're just getting back to where they started. This can't be attributed to the NEA. And American shouldn't be allowed to get away with it. So in addition to the output and the pricing harm and the unresponsiveness to consumer preference, that's just under the direct. We also have indirect. There was upward pricing pressure found at page 56 of the addendum. That was enough for the Sixth Circuit in the real comp decision. There, there were joint venture rules that diminished the downward pricing pressure of lower cost real estate brokers. Made it hard for them to compete for home buyers and sellers in the market. And the diminishing of their downward pricing pressure was an anti-competitive effect that the Sixth Circuit pointed to. If diminishing downward pricing pressure is an anti-competitive effect, so too is applying upward pricing pressure. They're equivalent. The district court also found, and this is at addendum 79, that the NEA increased barriers to entry. That's because of the First Amendment to the NEA. Can I just understand, on the upward pricing pressure point, there's some suggestion by your opponents that there needs to be a finding about some route in which that actually is plausibly true, given the market power of JetBlue and or American. What's your response to that? Because I don't think there is a route-specific finding on that score, unless you think there was. So American can't dispute that there were high market shares here. This is their own exhibit, DX1055, that we've pointed to in our brief. It has... Yeah, I guess what I think their suggestion was that the highest percentage ones are carve-out routes, and that the model supporting upward pricing pressure took into account revenue sharing. And the carve-out routes are the routes in which there is no revenue sharing. So what's the basis for finding the upward pricing pressure in non-carve-out routes, where there's evidence of a high enough percentage of the market that there would be plausible market power to support the upward pricing pressure? And was there a finding of that sort by the district court? So I have two responses to that question. First, the district court found that due to the other provisions under the NEA, and the spirit of partnership between JetBlue and American under the NEA, that competition was eliminated on the carve-out routes as well. This is at addendum 78. Now, but if you're asking about market shares on non-carve-out routes, there are extremely high market shares. 88% on Boston, DCA. 76% on Boston, Miami.  That's just a handful of examples. In addition to the non-stop overlap routes, in which over 20, although some of them included, the carve-outs had combined market shares over 30. Dr. Miller also calculated combined market shares in mixed overlap routes. And there were 20 in Boston alone, in which the parties had over 40% market share. These are routes where one of them had a direct non-stop flight, and another one had a competing one-stop route. So, numerous examples in the record. And the district court specifically credited Dr. Miller's concentration analysis that calculated those route-specific shares. That crediting is at addendum 79, footnote 80. In addition to the upward pricing pressure, where you have on all the routes, because Dr. Miller calculated a 16% price increase for JetBlue and American, and this is across the NEA, and 9% price increase for all the parties. So you have that upward pricing pressure, not just in the overlap routes, but in all of them. And you have an increase in barriers to entry, addendum 79. The Second Circuit in North American Soccer League held that joint venture rules that impose increased barriers to entry satisfied the indirect step. So we have the indirect step satisfied in numerous ways. I'd like to move to step two. There, American has said all of the benefits were knocked out on a legal ground. That's simply not true. Every single class of benefits was rejected on factual grounds. Is that true with respect to the one that I, if I follow on, I guess it's 90, addendum 95 in the district court's opinion when it's addressing the pro-contradictive effects of having a seamless NEA network. And the district court says, these features arise only if the defendants mimic one carrier or elect not to compete with one another and cooperate in ways that horizontal competitors normally would not. This elimination of competition negatively impacts the number and diversity of choices available to consumers. As such, quote, benefits, unquote, arising in this way cannot justify the defense collusion. That seems like a legal contention more than a factual one. So, just to take a step back, American and JetBlue claimed three general categories of benefits. There were enhanced product characteristics, increases in capacity is the second, and the third is competitor responses from Delta and United. This statement applies only to the enhanced, well, called enhanced product characteristics, who has better schedules and a bigger network. And what's the answer to that point? Those, as of addendum 94 and addendum 95, had already been rejected on factual grounds. So, better schedules. Where is that? I'll point you to addendum 44. Footnote 45, the court said that the schedules that American and JetBlue have created are worse for passengers because they move departure times off peak demand hours to worse times. So, rejected the schedules as worse for fliers. They're not better. On bigger network. This is at addendum 93, footnote 97. The court says for the majority of travelers, what they, the product that they seek. I guess I have just, if I'm following footnote 45, at least one way to read it, is it's just saying that this also could be support for an anti-competitive effect. So, it would support a direct anti-competitive effect at step one. I don't read footnote 45 to say in and of itself, therefore the claim benefit doesn't exist as a benefit. And if that's right, then I guess the argument would be, at addendum 95 is where the argument comes that it can't be a benefit at all in the weighing. And then the reason it gives for that is seemingly a legal reason, which is it can't be a benefit because it arises from them acting as one carrier, which is collusion that makes it impossible to be a benefit. Is there some other way in which the district court's saying that claim to benefit is not a benefit? So, I disagree with the reading of footnote 45. I do think what the court is saying is defendants are calling this pro-competitive. But I find in fact it's anti-competitive. So the two are linked. They view it as pro-competitive, but in fact it's anti-competitive. So that is both a rejection of their characterization as pro-competitive and a finding that it's anti-competitive. In addition, on addendum 94, there's footnote 99 that says another way of characterizing some of the defendants' claims, besides bigger is better, that they believe reducing the number of choices produces more choices. So again, it knows that they are claiming more choices, but it's saying that's not actually the right way to view it. This is a reduction in competition and it is in fact anti-competitive. I'll also point you to the top of addendum 89. This shows that the court knew full well defendants were arguing that their joint venture was making a better service for the customers. And the court rejected that. It points to the recitals in the NEA agreement where they claimed that their aim is to deliver significant customer benefits to enhance the experience of passengers. And the court said this, however, is simply not a fair characterization of the NEA's underlying purpose. And the court also said at the top of addendum 94, the purpose and effects of the NEA are to suppress rather than enhance competition. So the court knew the difference between benefits that make a customer's traveling experience better and product characteristics that were simply making the defendants more powerful. So we're talking about better schedules, but there's also the bigger picture. This was rejected at addendum 93, footnote 97. The court said the average passenger is not looking for a bigger network, but looking for point-to-point travel, and the NEA has not revolutionized that. And as for corporate customers, and that's really where American and JetBlue were saying there was really a class of customer that stood to benefit from a bigger network. At addendum 46, the court said there was simply no significant non-hearsay testimony provided by any of the corporate customers. And no corporate customer, in fact, had elected to make use of the joint bidding made available by the NEA, and that's what they would have to do to purchase directly the bigger network from both of the carriers at the same time. Counsel, in those, what you're arguing now, these are all factual findings, weight of the evidence, credibility determinations Judge Stroh can make, right? Absolutely. These are factual findings that Judge Stroh can make rejecting the defendant's contentions that there were pro-competitive benefits attributable to the NEA. He rejected it factually as to the enhanced product characteristics, he rejected it factually as to increased capacity, and he rejected it factually as to competitor responses from Delta and United. He said on that score, the evidence showed their responses were milquetoast at best, and the evidence they pointed to on Delta was merely consistent with the general recovery of the industry in New York from the COVID pandemic. Let me ask you an unrelated question. Counsel for Appellant may mention that it was a bit awkward that during the time of their agreement with JetBlue that U.S. DOJ intervened when normally it doesn't. Do you have any reaction to that? No. There was nothing odd or unusual about what the Department of Justice did here. It had an investigation and when it found that there was reason to believe that this was causing significant harm to competition, it stepped in. The DOT's investigation was separate. It's under a different statutory mandate 29 U.S.C. 41-720. And it had limited resources to investigate what was happening. The Department of Transportation made clear on the overall anti-competitive effects of the joint venture was deferring to the DOJ's judgment. DOJ's judgment was that this was an anti-competitive joint venture, and Judge Sorokin agreed. Can you just address... DOJ has to wait five years until the alleged antitrust conduct or a month? It has its discretion when to start, correct? Absolutely. Chicago Board of Trade in 1918 made clear that Section 1 applies to actual and probable effects. Here Dr. Miller explained why the actual pricing evidence was unlikely to be informative. This is during the COVID pandemic. The District Court explained it's very difficult to tell the actual effects because of the dramatic impact of COVID on the entire airline industry. It's also at a time when the airlines were under investigation. You can expect reasonable business people to hold off on price increases until the threat of litigation has passed. Could you address the mootness issue? Absolutely. It's not our contention that the dispute is moot. Not only does the injunction prevent JetBlue and American from re-entering into an NEA-like transaction, it also requires the defendants to notify the Department of Justice if they enter into any code-sharing or slot-lease agreements. In the government's view, there doesn't need to be anything in the record indicating a desire on the party subject to the injunction to do any of those things. Ordinarily, the burden is on the defendant to come forward with evidence to show that the case is moot. The presumption is that the case is not moot. So parties have to come forward and show there's no reasonable expectation of the conduct to occur. I think here, there would have to be evidence showing no reasonable expectation that they would make use of the notice provisions. Does the government have a view I'm sorry, finish that thought. The fact that the parties had entered prior to the NEA into a slot-lease agreement this was important on the pro-competitive benefits because a lot of what they were claiming actually came from that prior slot-lease agreement. I think it shows that these parties are inclined to enter into at least some form of agreement. So we think there's a live dispute over the injunction here. The fact that there's the injunction and it's ongoing and that USDOJ has to be notified if there's any other sort of co-sharing or agreement that is you know in the hypothetical world not a 100% straight jacket. They might come with some new agreement tomorrow and the USDOJ says well, this is different. We have no problem with that. And that could happen, correct? Absolutely, and that's perfectly consistent with Judge Sorokin's decision here. Americans tried to paint it throughout the appeal as broadly condemning all joint ventures and that's simply not true. The district court discussed favorably the West Coast International Alliance as a less restrictive type of joint venture. Didn't absolutely bless it. It would have to be analyzed under its own terms, but the court clearly found that would have been less restrictive. This is an alternative ground for affirming the district court below. The court at the top of Addendum 100 clearly said it was considering the benefits that American and JetBlue were pointing to and said that this alternative arrangement could have achieved those benefits. If they wanted to propose something like that they could. It's possible that it's on that anti-competitive that DOJ would evaluate it on its own terms and Judge Sorokin made it clear that that separate joint venture would be evaluated on its own terms. Thank you. Thank you very much. We ask this court to affirm the judgment below. Thank you. Thank you, counsel. At this time, if counsel for the appellant would please reintroduce himself back on the record. He has a three-minute rebuttal. Thank you, Your Honors. Gregory Gard for American Airlines. The decision in this case is infected by legal error. To go to step two, I think you're exactly right. Chief Judge Barron, the district court categorically refused to I understand that. I agree with your I want to emphasize your characterization, which I'm sure you agree with. I want to emphasize that point because schedule coordination, network optimization was one of the huge benefits of this agreement and the district court What do you say? I think the argument is being made that in ascertaining what the benefits are that are caused by this agreement, we should not consider those benefits that easily and foreseeably would have been caused by a less restrictive agreement such as mentioned by the court on addendum 100. So that's, again, completely contorting the rule of reason analysis. At step two, we have the burden to show pro-competitive rationales. We clearly did that and the district court refused to credit it. If you jump ahead to step three Is it a rationale caused by the agreement or something that could only be achieved by the agreement? Well, in this court, the court, I mean it says to show a rationale. This court in the Sullivan case said that this was not a high burden. The district court in this case contorted the burden by suggesting we had the burden to show strongly and unambiguously that's not the burden of the law. If you get to step three to consider less restrictive alternatives, you can't do that because that step was completely infected by the errors at step one and step two and that's why the district court itself said it basically wasn't going to engage in any serious step three analysis on page 99 and 101. I mean the district court's response to the step two point on page 95 of the addendum is to do exactly what the district court did when you asked about footnote 45. It pivoted and basically said you can't consider these patterns. Here's one possibility and you can come on this if you want. As I read some of the cases like Alston, the reviewing court there, the Supreme Court, seems somewhat willing to acknowledge that exactly what goes in step one, two, and three is not always the clearest and sometimes courts say things in the course of saying something step two that might better be thought of as a step three point and the reviewing court seems willing to read the record in a way that gives some credit to the basic points the district court's making even if the labels they give are not exactly right. So I take the thrust of the government's argument to be the sentence you've read in the addendum. Could be read as you're saying, I guess if I just came without any context and flew down from Mars, you could read that as saying as a legal matter because those benefits are the consequence of this anti-competitive conduct, they can't legally constitute as benefits. But I take the thrust of their point to being read in context in light of all the other findings. All it's saying is such benefits arising in the way they do can't justify the collusion because you have to take account of all the anti-competitive things that are also happening to facilitate those benefits, which really sounds a little bit like a weighing point, but it's not clear that he's saying, therefore I won't even look at the benefit side of it. It's just saying when I look at the benefit side of it, I have to see how did it come about. It came about through this negative also. And so if I'm trying to support, is this restraint legitimate? No, it's not when you look at both sides of the coin. What's wrong with reading the opinion that way? I mean, I don't think that's a fair characterization of what it said. It's not the way their own amicus read it. And this is something that goes to the heart of the rule of reason analysis. If there's any doubt on this, it has to be sent back for it to do it correctly. The entire analysis is infected by a quick look type rationale referring to naked restraints that have no place in an agreement that has pro-competitive benefits, referring to this being at one end of the spectrum. I mean, this colored the decision from page one. It's page one, the reference to what the meaning of competition is. I want to address upward pricing pressure quickly, Your Honor. That is not a price increase. It doesn't take into account the downward pressures, downward efficiencies, and the government's own expert acknowledged that on page 899-90 of the addendum where it said we do not consider efficiencies that would be the competition reacting to that. On market shares, the district court did not make any market share, which my friend, I think, essentially conceded by not pointing to any findings. There are none. That in itself eliminates any finding of market power, as does the absence of any finding that prices will increase based on a restriction for a non-transitory period. The district court here did not engage in any proper market power analysis, and that takes care of its indirect evidence finding. I want to say just two more things. In the credibility determinations as to the experts, those in themselves were infected by the court's legal misunderstanding of how the antitrust laws operate, and that's clear from footnote 78 of the decision, and then on the timing for bringing this challenge. Fundamentally, the government has to show harm, consumer harm, which is the harm to the competitive process that this court recognized in town of Concord in Grappone. Justice Breyer for the court emphasized that. Even the elimination of a competitor, Justice Breyer said, does not result in any competitive harm on itself, and the record in this case, plaintiff's own experts conceded they'd show no output reduction. A few frequencies as not output reduction because it doesn't refer to seats, it doesn't refer to the market at large, cannot be enough to justify this decision here. The decision was based on legal errors that this court should correct and send it back. Thank you. Thank you, Your Honors. Thank you, Counsel. That concludes argument in this case.